## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

DANIEL J. BARTOLUCCI and
EDWARD UNGVARSKY, on behalf of
themselves and all others similarly
situated,

        Plaintiffs,

        vs.

1-800 CONTACTS, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT**

JURY DEMAND

PROPOSED CLASS ACTION UNDER
FED. R. CIV. P. 23

## I.    CLASS ACTION COMPLAINT

1.    Plaintiffs Daniel Bartolucci and Edward Ungvarsky, by and through undersigned counsel, bring this action individually and on behalf of a class of all persons and entities similarly situated against 1-800 Contacts, Inc. ("1-800 Contacts") for damages and injunctive relief under the antitrust laws of the United States and the law of the District of Columbia. Plaintiffs allege as follows based on personal knowledge, investigation of counsel, or information and belief:

## II.    NATURE OF THE CASE

2.    Plaintiffs are proposed representatives of a nationwide class and Washington, D.C. subclass of purchasers who purchased contact lenses online from Defendant 1-800 Contacts, the largest retail seller of contact lenses in the United States and the dominant online seller of contact lenses.  Plaintiffs seek relief from 1-800 Contacts for violations of federal

antitrust law and related violations of the District of Columbia Consumer Protections Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*

3.     Since at least 2004, 1-800 Contacts has employed unlawful restraints of trade in violation of federal antitrust law in order to charge its customers supracompetitive prices.  In August 2016, the Federal Trade Commission (the "FTC") initiated administrative proceedings against 1-800 Contacts to stop it from engaging in anticompetitive conduct.  In its complaint, the FTC described the restraints and their effect on competition, and alleged that they violate Section 5 of the Federal Trade Commission Act.

4.     Starting around 2004, 1-800 Contacts began sending cease-and-desist letters to rival online sellers of contact lenses whose paid internet advertisements appeared in response to internet user search requests that used the term "1-800 Contacts" or common variations thereof. 1-800 Contacts claimed that its trademark rights in its name were infringed every time a rival's advertisement appeared on the results page when a user made an internet search using the term "1-800 Contacts" (or common variations thereof), including, for example, a search for "contacts cheaper than 1-800 Contacts."

5.     Faced with baseless but costly trademark litigation unless they agreed to forego certain lawful internet advertising, fourteen rival sellers acceded to 1-800 Contacts' threats and entered into unlawful agreements under which they agreed not to place bids for online advertising that would run in response to specified internet search queries, including any search containing the term "1-800 Contacts."  These bid-rigging and market-allocation agreements are horizontal agreements among competitors to artificially raise, maintain, fix and/or stabilize the prices for contact lenses sold online, directly-to-consumers, throughout the United States.  The agreements are unlawful *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"),

as well as under the so-called "quick-look" test and Rule of Reason used to evaluate agreements that are not unlawful *per se*.

6.      Plaintiffs, who reside in Washington, D.C., also seek relief under Washington, D.C.  Through its suppression of lawful, informative advertising, 1-800 Contacts deprived consumers of truthful, non-misleading information about competition in the online market for the sale of contact lenses.

7.      Plaintiffs seek relief for themselves and all persons similarly situated.  They seek relief under Section 1 on behalf of a proposed nationwide antitrust class, and they seek complementary relief for a proposed Washington, D.C. subclass under the District of Columbia Consumer Protections Procedures Act.

## III.    THE PARTIES

8.      Plaintiff, Daniel J. Bartolucci, is an individual who maintains his domicile in Washington, D.C.  From January 1, 2004 through the present ("the Class Period"), including during the past four years, Bartolucci purchased contact lenses directly from 1-800 Contacts through its website, while he was residing in D.C.  Bartolucci purchased these lenses at supracompetitive prices, and was injured thereby.

9.      Plaintiff, Edward Ungvarsky, is an individual who maintains his domicile in Washington, D.C.  During the Class Period, including during the past four years, Ungvarsky purchased contact lenses directly from 1-800 Contacts through its website, while he was residing in D.C.  Plaintiff Ungvarsky purchased these lenses at supracompetitive prices, and was injured thereby.

10.      Defendant 1-800 Contacts is a corporation formed under the laws of Delaware, which maintains its headquarters in Draper, Utah. 1-800 Contacts sells contact lenses and related products over the internet throughout the United States, including to D.C. residents.

## IV.   JURISDICTION AND VENUE

11.   **Subject-Matter Jurisdiction.**  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1337(a), and Sections 4 and 6 of the Clayton Act (15 U.S.C. §§ 15 and 26).  The claims in this case arise under federal antitrust law and present one or more federal questions; they also present claims between citizens of different states in an amount which exceeds $75,000; and they present claims in which the aggregate amount in damages for the putative class exceeds $5 million and at least one member of the class is a citizen of a different state than 1-800 Contacts.

12.   Plaintiffs' state causes of action arise under the statutory laws of Washington, D.C. (the "Washington, D.C. Claims").  The Washington, D.C. Claims arise from the same transactions, occurrences, and "nucleus of operative fact" that have given rise to Plaintiffs' first cause of action, over which this Court has original and exclusive jurisdiction, as pled above. This Court therefore has supplemental subject-matter jurisdiction over the Washington, D.C. Claims under 28 U.S.C. § 1367(a), and there is no proper cause to withhold supplemental jurisdiction under 28 U.S.C. § 1367(c).

13.   **Personal Jurisdiction.**  This Court has personal jurisdiction over 1-800 Contacts under 15 U.S.C. §§ 15 and 22 because 1-800 Contacts: (a) has and does transact business and is found throughout the United States, including in this District; (b) sold hundreds of millions of dollars in and provided services related to contact lenses throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

14.    **Venue.**  This Court is the proper venue for the present action because: (a) 1-800 Contacts conducts substantial commerce in this District; (b) 1-800 Contacts has engaged in the challenged conduct and employed the challenged trade restraints in this District; (c) Plaintiffs purchased contact lenses from 1-800 Contacts during the Class Period while residing in this District; (d) 1-800 Contacts overcharged Plaintiffs, deprived them of alternative offerings, and delivered contact lenses to them in this District; and (e) Plaintiffs suffered antitrust injury in this District because of 800-Contacts' challenged conduct. This Court is therefore the proper venue in which to adjudicate Plaintiff's claims.  *See* 28 U.S.C. § 1391(b) and (c).

## V.    COMMON ALLEGATIONS

### A.    Search Engine Advertising and 1-800 Contacts' Anti-Competitive Conduct

15.    1-800 Contacts was founded in 1995 and has long been the largest online seller of contact lenses in the United States.  In 2006, its last year as a public company, the company reported net sales of $247 million.  1-800 Contacts was sold for about $900 million in 2012 and is now owned by a private equity firm.

16.    While 1-800 Contacts dominated the growing market for selling contact lenses online since its founding, it recognized as early as 2003 that it was losing sales to its lower priced online competitors.  Because 1-800 Contacts did not want to lower its prices to compete with these rivals, it devised a plan to manipulate the market for the placement of online advertisements through online search engines such as Google and Bing, which sell advertising space on their search engine results pages through computerized auctions.

17.    Search advertising refers to the paid advertisements that appear, in response to a search query, on the search engine page above or adjacent to the unpaid "organic" or "natural" results.  Companies submit "bids" to the search engine companies specifying how much they are willing to pay to place a particular advertisement on the results page.  One common strategy for

companies is to bid on auctions containing certain words known as "keywords."  When a consumer enters a search query, an algorithm instantly evaluates the relevant bids.  If a company wins the auction, its advertisement is placed on the search results page, and if the consumer clicks on that advertisement, the company pays a fee to the search engine company.

18.     In or around 2004, 1-800 Contacts began sending cease-and-desist letters to rival online sellers of contact lenses whose search advertisement appeared in response to user queries containing the term "1-800 Contacts" (or variations thereof)—and soon thereafter began filing lawsuits against these rivals.  In those letters and follow-up lawsuits, 1-800 Contacts accused its competitors of infringing its trademarks, erroneously claiming that the mere fact that a rival's advertisement appeared on the results page in response to a query containing 1-800 Contacts' trademark constituted infringement.

1-800 Contacts sued the following online contact lens retailers:

a)     JSJ Enterprises: JSJ sold contact lenses at www.contactlensconnection.com.[1]

b)     Premier Holdings: Premier Holdings sold contact lenses at www.ezcontactusa.com and www.filmart.com.[2]

c)     LensWorld: LensWorld sold contact lenses at www.lensworld.com, www.contactmania.com and www.contactlensworld.com.[3]

d)     Lensfast: Lensfast sold contact lenses www.lensfast.com, www.contactlens.com and www.e-contacts.com. It also sold contacts over the telephone at 1-800 LENSFAST.[4]

e)     Lenses for Less: Lenses for Less sold contact lenses at www.lensesforless.com.[5]

---

[1] *1-800 Contacts v. JSJ Enterprises, Inc.*, 2:2002-cv-00705 (filed July 23, 2002, closed Aug. 21, 2002).

[2] *1-800 Contacts v. Premier Holdings*, 2:2007-cv-00946 (filed Dec. 6, 2007, closed May 16, 2008).

[3] *1-800 Contacts v. Lensworld.com*, 2:2008-cv-00015 (filed Jan. 8, 2008, closed Sep. 9, 2008).

[4] *1-800 Contacts v. Lensfast*, 2:2008-cv-00984 (filed Dec. 23, 2008, closed Feb. 3, 2010).

[5] *1-800 Contacts v. Lenses for Less*, 2:2010-cv-00041 (filed Jan. 20, 2010, closed Mar. 29, 2010).

f)      Arlington Contact Lens Service: Arlington Contact Lens Service, which did business as Discount Contact Lenses, sold contact lenses at www.discountcontactlenses.com and www.aclens.com.[6]

g)      Empire Vision Center: Empire Vision Center sold contact lenses at www.lens123.com.[7]

h)      Contact Lens King: Contact Lens King sold contact lenses at www.contactlensking.com.[8]

i)      Tram Data: Tram Data LLC sold contact lenses at www.replacemycontacts.com.[9]

j)      Walgreen Company: Walgreen Company sold contact lenses at www.walgreens.com.[10]

k)      Standard Optical: Standard Optical sold contact lenses at www.standardoptical.net.[11]

l)      Web Eye Care: Web Eye Care, Inc. sold contact lenses at www.webeyecare.com.[12]

m)      Memorial Eye: Memorial Eye P.A. sold contact lenses at www.shipmycontacts.com, www.ship-my-contacts.com, and www.iwantcontacts.com.[13]

19.      All but one rival quickly acceded to 1-800 Contacts' demands, either before litigation began or shortly thereafter.  In settlements that were not approved by the court or even submitted to the court, 1-800 Contacts secured agreements with at least fourteen competing online sellers of contact lenses providing that the parties would not bid against one another in certain search advertising auctions (the "Bidding Agreements").  All fourteen Bidding Agreements bar 1-800 Contacts' competitors from bidding in a search advertising auction for any of 1-800 Contacts' trademarked terms or variations thereof (such as common misspellings).

---

[6] *1-800 Contacts v. Arlington Contact Lens Service*, 2:10-cv-00131 (filed Feb. 18, 2010, closed Mar. 10, 2010).

[7] *1-800 Contacts v. Empire Vision Center*, 2:10-cv-00173 (filed Feb. 25, 2010, closed May 18, 2010).

[8] *1-800 Contacts v. Contact Lens King*, 2:10-cv-00205 (filed Mar. 8, 2010, closed April 8, 2010).

[9] *1-800 Contacts v. Tram Data*, 2:10-cv-00420 (filed May 6, 2010, closed July 28, 2010).

[10] *1-800 Contacts v. Walgreen*, 2:10-cv-00536 (filed June 8, 2010, closed July 20, 2010).

[11] *1-800 Contacts v. Standard Optical*, 2:10-cv-00643 (filed July 13, 2010, closed Feb. 7, 2011).

[12] *1-800 Contacts v. Web Eye Care*, 2:10-cv-00770 (filed Aug. 10, 2010, closed Sept. 13, 2010).

[13] *1-800 Contacts v. Memorial Eye*, 2:2008-cv-00983 (filed Dec. 23, 2008, closed Aug. 17, 2011).

All fourteen Bidding Agreements are reciprocal, barring 1-800 Contacts from bidding for the competitors' trademarked terms or variations thereof. Thirteen of the Bidding Agreements also require 1-800 Contacts' competitors to employ "negative keywords" directing the search engines not to display the competitor's advertisement in response to a search query that includes any of 1-800 Contacts' trademarked terms or variations thereof, even if the search engines' algorithms determine that the advertisement would be relevant and useful to the user.

20.     In other words, as 1-800 Contacts—the country's largest online seller of contact lenses—engineered this market allocation scheme, certain searches were reserved to 1-800 Contacts alone, and certain searches were reserved for its smaller competitors, thus effectively insulating 1-800 Contacts and its co-conspirators from competition.

21.     While 1-800 Contacts entered into formal individual agreements with its various co-conspirators, the other co-conspirators were aware and/or willingly benefitted from the anticompetitive agreements with other co-conspirators. The set of agreements—like a hub-and-spoke conspiracy—benefitted each of the participants by, among other things, allowing each to charge supracompetitive prices to the detriment of consumers.

22.     Moreover, the anticompetitive agreements enabled each conspirator to readily ensure that no competitor was cheating on the conspiracy or violating the terms of their agreement. All it would take to ensure that a competitor was abiding by the conspiracy was a simple internet search.

23.     As the FTC's complaint explains, as a result of these agreements, if a consumer entered the following as a search query before the FTC filed its complaint—"1-800 Contacts cheaper competitors"—no advertising from any competitors would appear.

24.    "The Bidding Agreements go well beyond prohibiting trademark infringing conduct.  They restrain a broad range of truth, non-misleading, and non-confusing advertising," as the FTC explained in its complaint against 1-800 Contacts.

**B.    Relevant Market**

25.    Plaintiffs' antitrust claim arises from 1-800 Contacts' *per se* violations of Section 1 of the Sherman Act—its organization and enforcement of a bid-rigging conspiracy and its organization of a horizontal market-allocation scheme to fix, raise, maintain, or stabilize prices at artificially inflated levels.  Although not required to establish the antitrust violated alleged here, Plaintiffs also allege relevant markets at issue and have pled how 1-800 Contacts' conduct has harmed competitive processes in these markets.

26.    **Relevant Markets.**  The relevant market in which 1-800 Contacts has committed antitrust offenses is the market for retail sales of contact lenses in the United States, as well as a submarket for online retail sales of contact lenses in the United States (collectively, the "contact lens markets").  Alternatively, the relevant market for antitrust purposes is only the market for online sales.

27.    **Contact Lenses Constitute a Relevant Product Market.**  Contact lenses are medical devices used to improve vision, treat defective vision, and/or improve the physical appearance of the user.  Contact lenses are medical devices for which there is no reasonably interchangeable substitute product.  There is only one other product—eyeglasses—that can perform only some of the same functions and only in some cases.  Individuals who wear contact lenses only or wear both contact lenses and eyeglasses would not stop wearing contact lenses and switch to eye-glasses even if there were a statistically significant, non-transitory increase in the price for contact lenses.  Rather, most users of contact lenses would continue to purchase and use them even when faced with a statistically significant, non-transitory increase in price.

28.     Similarly, because of the significant convenience of purchasing contacts without going to a physical store, the traditional retail market for contacts exists separately, and is not a substitute for online sales.  A small but significant and non-transitory increase in the price of online contacts would not drive consumers to purchase contacts in a physical store.

29.     There exists a distinct market for online retail sales of contact lenses in the United States.  In this submarket, there are specialized sellers, distribution channels, logistics, promotional strategies, demand curves, and prices.  There also exists a distinct subset of customers—consumers who look principally or solely to online sellers in order to buy contact lenses because they believe that online sellers provide the most convenient service (home delivery) and the lowest prices.  There is widespread recognition among all of these market participants that online retail sales of contact lenses has become a distinct market or submarket within a larger market for retail sales of contact lenses in the United States.

30.     **The Geographic Market Is No Larger Than the United States.**  Nearly all contact lenses sold in the United States are produced by one of four principal manufacturers. These manufacturers use special distribution and sales channels to distribute their products in the United States.  They sell their products directly to prescribing ophthalmologists and optometrists, wholesale distributors, pharmacies, specialized retailers, mass merchandisers, online retailers, and other retailers.

31.     Defendant 1-800 Contacts, along with other online retailers of contact lenses, sells to customers located across the United States.

32.     The relevant geographic market for this antitrust action regarding for the online sale of contact lenses cannot be larger than the United States.  In the United States, contact lenses are regulated as medical devices by the United States Food and Drug Administration, which

imposes special regulatory requirements on their manufacture, distribution, and sale that are not imposed on contact lenses that are made, distributed, or sold abroad.  Additionally, in the United States, contact lenses are sold in distinct "sales channels" that are not used to sell these products in any other region of the world.

33.     **Barriers to Entry.**  There are significant barriers to entry by new market participants, which protect 1-800 Contacts and its co-conspirators in the relevant market(s) from vigorous or meaningful competition.  Those barriers include: (a) the investment in the infrastructure and personnel necessary to support online commerce; (b) establishing relationships with contact lens manufacturers and acquiring distribution rights from contact lens manufacturers to sell their products online; (c) the need for substantial inventory of contact lenses from various manufacturers to provide consumers with prompt delivery of purchased products; and (d) overcoming the lead of the dominant seller 1-800 Contacts and attracting enough customers to pay substantial operating expenses.

### C.     Anticompetitive Effects and Plaintiffs' Antitrust Injuries

34.     Defendant's conduct harmed Plaintiffs, the Class, and the Washington, D.C. Subclass by depriving them of a marketplace in which consumers of contact lenses make their decisions about the purchase of contact lenses free from the influence of Defendant's agreements with its competitors, agreements which collectively restrain truthful advertising by competitors responsible for the vast majority of direct-to-consumer sales of contact lenses.  While 1-800 Contacts has approximately 50 percent of the online retail sale of contact lenses, the combined share of 1-800 Contacts and the fourteen retailers that executed the Bidding Agreements is approximately 80 percent, according to the FTC.

35.     Defendant's market-allocation/price-fixing conspiracy had the following anticompetitive effects, among others: (a) price competition has been restrained or eliminated

11

with respect to contacts lenses sold online directly to consumers in the United States and the District of Columbia; (b) the price of contact lenses sold online directly to consumers in the United States and the District of Columbia has been fixed, raised, maintained, or stabilized at artificially inflated levels; and (c) purchasers of contact lenses sold online directly to consumers in the United States and the District of Columbia have been deprived of free and open competition. During the Class Period, Plaintiffs and the members of the Class and the District of Columbia paid supracompetitive prices for contact lenses sold online directly to consumers in the United States and the District of Columbia.

36.    Plaintiffs have suffered significant injury as a result of Defendant's contact lens price manipulation conspiracy. 1-800 Contacts' illegal trade restraints reached enough prospective customers so that 1-800 Contacts could protect itself sufficiently from competition in order to maintain supracompetitive prices and/or practice price discrimination by charging supracompetitive prices to all its online customers. Typically, when consumers conduct web searches for contact lenses, they are presented with competing offers from various contact lens sellers. Any sellers who were offering the same contact lenses at prices higher than their competitors would either (a) risk losing business to rivals, or (b) lower prices to bring them in line with their competitors' prices and compete for the business. However, through agreements that rigged search results in response to online user queries, Defendant ensured that consumers were presented with only one option in response to their internet search. But for Defendant's anticompetitive conduct, consumers would have been aware of and presented with competing options from various sellers of contact lenses.

37.    1-800 Contacts restricted output in the online contact lens markets by charging supracompetitive prices, which inevitably restrict output, and also by suppressing advertising and

the dissemination of information about products, which is a form of output and which is useful to consumers in these markets.  By reason of the alleged violations of federal and the District of Columbia laws, Plaintiffs and the members of the Class and the District of Columbia Subclass have sustained injury to their business or property in the form of the overcharges in an amount presently undetermined, which they paid for contact lenses sold online directly to consumers in the United States and the District of Columbia. This is an antitrust injury of the type that the antitrust laws were designed to prevent and to punish when it occurs.

38.    Plaintiffs and the other members of the proposed class suffered antitrust injuries in proximate consequence of the anticompetitive conduct of 1-800 Contacts' and its co-conspirators.

## VI.    CLASS-ACTION ALLEGATIONS

39.    Plaintiffs re-plead and incorporate by reference each of the preceding allegations.

40.    Plaintiffs' claims against 1-800 Contacts satisfy the criteria, set forth at Federal Rule of Civil Procedure 23, for litigating these claims in a class-action.

41.    **The National Antitrust Class.**  Plaintiffs and all other similarly situated persons have been directly harmed by the anticompetitive character, purpose, and effect of 1-800 Contacts' conspiracy to artificially raise, maintain, fix, and/or stabilize the prices for contact lenses sold online, directly-to-consumers, throughout the United States.  Plaintiffs are members of this proposed class (the "National Antitrust Class"), which consists of all legal persons who purchased contact lenses online directly from 1-800 Contacts since January 1, 2004.

42.    The National Antitrust Class is readily ascertainable and the records exist to ascertain Class membership.

13

43.     By suppressing its rivals' advertising and ability to make sales to customers who ran specified search queries, 1-800 Contacts was able to charge higher prices than it would have been able to do had it faced competition from its rivals for these sales.

44.     Because of 1-800 Contacts' anticompetitive practices, Plaintiffs and the other members of the National Antitrust Class overpaid for contact lenses that they purchased online directly from 1-800 Contacts during the stated period.

45.     Because of 1-800 Contacts' anticompetitive practices, Plaintiffs and the other members of the National Antitrust Class were deprived of consumer choice.  Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs now bring a proposed class-action on behalf of themselves and the following members of the proposed National Antitrust Class:

> All persons in the United States who made online purchases of contact lens products from 1-800 Contacts and not for resale from January 1, 2004 until the date on which class notice is given.

> The proposed National Antitrust Class excludes 1-800 Contacts, any entity in which 1-800 Contacts has a controlling interest or that has a controlling interest in it, and 800-Contacts' legal representatives, assignees, and successors.  Also excluded are the judge and magistrate judge to whom this case is assigned as well as all members of the judge's immediate family and the magistrate judge's immediate family.

46.     **Numerosity.**  The National Antitrust Class consists of at least many thousands of persons, and probably tens if not hundreds of thousands of persons.  It is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the Class which is known to Defendant and its co-conspirators, and its members are dispersed across the United States.

47.     **Common Issues Predominate.**  Each member of the National Antitrust Class claims that 1-800 Contacts employed unlawful restraints of trade in violation of Section 1, and

14

that by so doing it overcharged each member for contact lenses that it sold to him or her.  The

principal issues of fact and law that arise from this claim are common to the members of the

proposed class, and these issues predominate.

48.     The common issues of fact and law include the following:

a)     Whether Defendant and its co-conspirators entered into agreements, combinations
or one or more conspiracies to rig the bidding in search engine advertising
auctions, increase or maintain supracompetitive prices for contact lenses, allocate
the market for online sales of contact lenses, and/or prevent the dissemination of
information regarding pricing of contact lenses by competitors;

b)     The identity of the participants in the alleged conspiracy;

c)     The duration of the alleged conspiracy and what acts were performed by
Defendant and their conspirators in furtherance of the conspiracy;

d)     Whether 1-800 Contacts' several agreements with its rivals were unlawful *per se*
under Section 1; and

e)     How much was 1-800 Contacts able to overcharge for contact lenses that it sold in
the United States during the Class Period because of its agreements with its rivals.

49.     1-800 Contacts has engaged in a common course of conduct toward Plaintiffs and

members of the National Antitrust Class.  The common issues arising from this conduct that

affect Plaintiffs and Class members predominate over any individual issues.

50.     **Plaintiffs' Claims Are Typical.**  Plaintiffs are direct purchasers who within the

Class Period made online purchases of contact lenses directly from 1-800 Contacts.  They

overpaid for these contact lenses by paying supracompetitive prices for them, and they were

deprived of consumer choice.  They therefore have a typical claim that is essentially identical to

the claim held by each member of the proposed class.

51.     **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the

proposed class.  Plaintiffs have retained competent attorneys who have significant experience in

antitrust litigation and class action litigation, including consumer class actions.  Plaintiffs and

their counsel are committed to prosecuting this action vigorously on behalf of the proposed class

and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests that are contrary to, or in conflict with, those of the proposed class.

52.     Plaintiffs are therefore appropriate representatives of the proposed class members who can proficiently litigate the present antitrust challenge on behalf of the proposed National Antitrust Class.

53.     **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Adjudication of the common issues of fact and law in a single action will promote judicial economy, as it would not be practical for individual class members to litigate their claims independently.  Doing so would be cost-prohibitive, and in any event would necessarily result in duplicative procedures and might result in inconsistent adjudications of identical issues of fact and law.

54.     **Damages, Injunctive and Declaratory Relief Appropriate.**  Plaintiffs' proposed class action is appropriate under Fed. R. Civ. P. 23(b)(2) and 23(b)(3).  On behalf of all members of this class, Plaintiffs seek compensatory damages in an amount to be proven at trial, as well as injunctive relief against 1-800 Contacts in order to prevent it from persisting in its anticompetitive conduct.

55.     **The Washington, D.C. Subclass.**  Plaintiffs and certain Class members also belong to the following subclass (the "Washington, D.C. Subclass"): consumers located in Washington, D.C. who during the Class Period purchased contact lens online from 1-800 Contacts for personal, family, or household purposes.

56.     Plaintiffs and the other members of the Washington, D.C. Subclass were, as a result of 1-800 Contacts' conduct, deprived of truthful, non-misleading information about competition in the online market for the sale of contact lenses.

57.     Plaintiffs and other members of the Washington, D.C. Subclass therefore seek appropriate relief under the District of Columbia Consumer Protections Procedures Act.

58.     **Numerosity.**  The proposed Washington, D.C. Subclass consists of many thousands of persons.  It is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the Class which is known to Defendant and its co-conspirators.

59.     **Common Issues Predominate.**  Each member of the proposed Washington, D.C. Subclass claims that 1-800 Contacts violated the District of Columbia Consumer Protections Procedures Act.  The principal issues of fact and law that arise from this claim are common to the entire Washington, D.C. Subclass, and these issues predominate.

60.     The common issues of fact and law include the following:

a)     Whether, by entering into Bidding Agreements to suppress advertising and allocate markets, did 1-800 Contacts "misrepresent as to a material fact" which had a "tendency to mislead."

b)     Whether, under the circumstances, did 1-800 Contacts "fail to state a material fact" when "such failure tends to mislead."

c)     Whether, under the circumstances, did 1-800 Contacts "make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time."

d)     Whether, under the circumstances, did 1-800 Contacts "falsely state the reasons for offering or supplying goods or services at sale or discount price."

e)     Whether, under the circumstances, there was a "gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees."

61.     1-800 Contacts has engaged in a common course of conduct toward Plaintiffs and members of the proposed Washington, D.C. Subclass.  The common issues arising from this conduct that affect Plaintiffs and class members predominate over any individual issues.

62.     **Plaintiffs' Claims Are Typical.**  Plaintiffs are direct purchasers who made online purchases of contact lenses from 1-800 Contacts since January 1, 2004.  They overpaid for these

contact lenses by paying supracompetitive prices for them, and they were deprived of consumer choice, and have a typical claim that is essentially identical to the claim held by of each member of the proposed Washington, D.C. Subclass, and their claim depends on the adjudication of the above-listed common issues of fact and law.

63. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the proposed Washington, D.C. Subclass. Plaintiffs have retained competent attorneys who have significant experience in complex commercial litigation and class-action litigation, including consumer class-actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the proposed class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to, or in conflict with, those of the proposed class.

64. Plaintiffs are therefore appropriate representatives of the proposed class members who can litigate the present challenge under the District of Columbia Consumer Protections Procedures Act proficiently on behalf of the proposed class.

65. **Superiority.** A class-action is superior to other available methods for the fair and efficient adjudication of the claims made on behalf of the Washington, D.C. Subclass. Adjudication of the common issues of fact and law in a single action will promote judicial economy, as it would not be practical to oblige individual class members to litigate their Washington, D.C. claims independently. Doing so would be cost-prohibitive. If each claimant were somehow to litigate his or her Washington, D.C. claims separately, these litigations would necessarily result in duplicative procedures and might result in inconsistent adjudications of identical issues of fact and law.

66.     **Damages, Injunctive and Declaratory Relief Appropriate.**  Plaintiffs' proposed class-action for the Washington, D.C. Subclass is appropriate under Fed. R. Civ. P. 23(b)(2) and 23(b)(3).  On behalf of all class members, Plaintiffs seek compensatory damages in an amount to be proven at trial, as well as injunctive relief against 1-800 Contacts in order to prevent it from persisting in its anticompetitive conduct.

### A.     Interstate and Intrastate Commerce

67.     At all relevant times, 1-800 Contacts and its co-conspirators promoted, distributed and sold substantial amounts of contact lenses in a continuous and uninterrupted flow of commerce across state lines throughout the United States.

68.     Defendant transmitted and received funds, invoices, contracts, correspondence, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state lines throughout the United States.

69.     In furtherance of its efforts to restrain competition, Defendant employed the United States mails and interstate telephone lines, as well as interstate travel.  Defendant's activities were within the flow of, and have substantially affected (and will continue to substantially affect), interstate commerce.

70.     Defendant's anticompetitive conduct also had substantial effects within the District of Columbia, in that price competition in the District of Columbia has been restrained or eliminated with respect to contact lenses sold directly to consumers online.  The price of contact lenses sold online directly to consumers in the District of Columbia has been fixed, raised, maintained or stabilized at artificially inflated levels, and purchasers of contact lenses sold online directly to consumers in the District of Columbia have been deprived of free and open competition.  The agreements to restrict bidding in search advertising auctions for the online sale of contact lenses directly impacted and disrupted commerce within the District of Columbia.

71.     During the Class Period, contact lenses sold online by Defendant were shipped into the District of Columbia and were sold to or paid for by Plaintiffs and Class members in the District of Columbia.

**B.     Fraudulent Concealment and Tolling**

72.     1-800 Contacts affirmatively concealed from Plaintiffs and other Class members its unlawful conduct.  1-800 Contacts created and implemented its unlawful plan in private, and affirmatively avoided publicly disclosing the scheme, and took other actions to hide and conceal the unlawful conduct.

73.     For instance, 1-800 Contacts negotiated and settled its baseless trademark infringement lawsuits in secret, concealing the details and the true nature of these anticompetitive agreements from Plaintiffs, other Class members, and the public.  1-800 Contacts fraudulently concealed from the public and from Plaintiffs the anticompetitive, fraudulent, and deceptive nature of each of the Bidding Agreements, which were disguised as private, trademark lawsuit "settlements," but were not submitted to the courts, let alone approved by the courts.

74.     Moreover, 1-800 Contacts made numerous misleading public statements about the purported competition in the market for the online retail sale of contact lenses. Indeed, shortly before the FTC filed its complaint, 1-800 Contacts' director of business development stated that "1-800 Contacts is dedicated to providing customers with more choice, greater, convenience, and lower prices."  Yet, 1-800 Contacts was then covertly engaged in anticompetitive acts to deprive those same consumers of choice.

75.     Similarly, in July 2014, 1-800 Contacts' General Counsel testified in a Hearing before the Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition Policy, and Consumer Rights that the company "served over 15 million unique customers who value

having choice in where they purchase their contact lenses."   Again, at this same time, 1-800

Contacts was engaged in anticompetitive acts so 1-800 Contacts could foreclose competition,

reduce consumer choice, and charge higher prices for online contact lenses.

76.     Accordingly, Plaintiffs and other Class members did not discover, nor could they

discover through reasonable diligence, 1-800 Contacts' anticompetitive conduct alleged herein.

1-800 Contacts' (and/or its co-conspirators') false and misleading statements or omissions lulled

Plaintiff and other Class members into believing that the online retail prices paid for contact

lenses were the result of  competitive market forces rather than collusive or anticompetitive

practices.

77.     It was not until the filing of the FTC Complaint on August 8, 2016 that Plaintiffs

and other Class members reasonably could have known of the unlawful conduct alleged herein;

and yet, even details in the FTC Complaint are redacted.  Accordingly, Defendant is equitably

estopped from asserting that any applicable limitation period has run, or that the statute of

limitations began running before August 8, 2016.

**C.     1-800 Contacts' Unilateral Arbitration Provision Is Not Binding and Is Unenforceable**

78.     1-800 Contacts' website has a "Terms of Service" page which states:  "Any

dispute relating in any way to your visit to this website or to products you purchase through us

shall be submitted to confidential arbitration in Salt Lake City, Utah, except that, to the extent

you have in any manner violated or threatened to violate our intellectual property rights, we may

seek injunctive or other appropriate relief in any state or federal court in the state of Utah, and

you consent to exclusive jurisdiction and venue in such courts."

79.     This paragraph about arbitration, however, is not binding on Plaintiffs, the Class,

or the Washington, D.C. Subclass.  Any agreement to arbitrate is not specifically highlighted on

1-800 Contacts' website.  In fact, there are no direct links to the "Terms of Service" page on 1-800 Contacts' home page.  Rather, the link to the arbitration provision is on an obscure page of 1-800 Contacts' website that is difficult to find even if the user specifically sets out to find it.  The only way to find the "Terms of Service" page is to click on the "Common Questions (FAQ)" link on the 1-800 Contacts' homepage, which itself is in extremely small print and is likely to be overlooked.

80.     After clicking on the "Common Questions" link, there is still no immediate mention of arbitration. Instead, the last link on the "Common Questions" page, which has to be scrolled down to see in most browsers, is a link entitled "Terms of Service."

81.     After clicking on the "Terms of Service" link, a consumer can finally access the "Terms of Service" page, which contains the mention of arbitration.  Even in the unlikely event that a consumer did find and review the "Terms of Service" page before ordering contact lenses through 1-800 Contacts' website, the arbitration language is only viewable if a user scrolls down to a section titled "Disputes."

82.     Nor does 1-800 Contacts' website offer a search tool that allows a user to search the website for "terms," "conditions," "arbitration," "grievances," "dispute resolution," or anything of the sort.  The only search box on the website is one that allows a user to look specifically for different brands and kinds of contact lenses.

83.     In addition, there is no place for a consumer to acknowledge receipt of the arbitration provision or for a consumer to acknowledge that it understood that it was governed by the arbitration provision.  In fact, there is no requirement that a 1-800 Contacts customer even see the arbitration provision before ordering contacts through 1-800 Contacts' website, let alone take action to expressly consent to the arbitration provision.  As such, there was never any

meeting of the minds, as required by law, regarding the arbitration of disputes, and any reasonable user of 1-800 Contacts' website would be surprised by the existence of the arbitration provision.

84.      Moreover, 1-800 Contacts retained the full right to unilaterally modify the terms of the arbitration agreement, as shown by its carve out of intellectual property disputes.

85.      Accordingly, 1-800 Contacts' arbitration provision is unconscionable, contrary to public policy, and unenforceable.

### FIRST CAUSE OF ACTION
### (Violations of Section 1 of the Sherman Act)
### (On Behalf of the National Antitrust Class)

86.      Plaintiffs re-plead and incorporate by reference each of the preceding allegations.

87.      Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Antitrust Class.

88.      Defendant, and its co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3.  The conspiracy consisted of a concerted action, continuing agreement, or understanding between and among Defendant and their co-conspirators in furtherance of which Defendant artificially raised, maintained, fixed, and/or stabilized the prices for contact lenses sold online directly to consumers throughout the United States.

89.      Defendant's conspiracy is a *per se* violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade.  Defendant's unlawful conduct was facilitated through mutual understandings, combinations or agreements by, between and among 1-800 Contacts, and other co-conspirators.

90.     There is no procompetitive benefit caused by, or legitimate business justification for, Defendant's unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

91.     1-800 Contacts' restraints of trade are unlawful not only under well-established *per se* prohibitions, but also under the "quick-look" standard of review and the Rule of Reason: they are anticompetitive restraints that lack any legitimate business justification, and have had an actual, sustained adverse effect on competition and caused harm to competitive processes in the markets in which they have been employed.

92.     Defendant's conspiracy, the resulting impact on the prices of contact lenses, and the information provided to consumers, occurred in and affected interstate commerce and commerce in and between the territories of the United States.

93.     As a direct, intended, foreseeable, and proximate result of Defendant's conspiracy and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered injury.  Plaintiffs' and each Class member's damages are directly attributable to Defendant's conduct, which resulted in all Class members paying more for contact lenses than they would have paid without Defendant's agreements.

94.     As a co-conspirator, 1-800 Contacts is jointly and severally liable for damages suffered by the National Class Members as a result of online sales by its co-conspirators.

95.     Plaintiffs' and the Class members' injuries are precisely the type of antitrust injuries the antitrust laws were designed to prevent and their injuries flow directly Defendant's unlawful conduct.

WHEREFORE, Plaintiffs and the Class seek treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Antitrust Act.

**SECOND CAUSE OF ACTION**
**(Violations of the District of Columbia Consumer Protections Procedures Act)**
**(On Behalf of the Washington, D.C. Subclass)**

96.     Plaintiffs re-plead and incorporate by reference each of the preceding allegations.

97.     Plaintiffs bring this cause of action on behalf of themselves and the Washington, D.C. Subclass, seeking relief for 1-800 Contacts' various violations of the District of Columbia Consumer Protections Procedures Act ("CPPA"), which is codified at D.C. Code §28-3901 *et seq.*

98.     Plaintiffs and all other members of the Washington, D.C. Subclass meet the prerequisites for asserting the present claim under the CPPA:

a)     Plaintiffs and the other members of the Washington, D.C. Subclass are consumers who purchased contact lenses from 1-800 Contacts for personal, family, or household purposes and not for resale.  Accordingly, Plaintiff and the other members of the Washington, D.C. Subclass are "consumers" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(2).

b)     The contact lenses that Plaintiffs and the other members of the Washington, D.C. Subclass purchased from 1-800 Contacts were "goods" within the meaning of the CPPA.  *See* D.C. Code § 28-3901(a)(7).

c)     1-800 Contacts is a "person" within the meaning of the CPPA.  *See* D.C. Code § 28-3901(a)(1).

d)     The purchases of contact lenses from 1-800 Contacts by Plaintiffs and all other members of the Washington, D.C. Subclass were "trade practices" within the meaning of the CPPA.  *See* D.C. Code § 28-3901(a)(6).

99.     1-800 Contacts has violated various provisions of the CPPA by its above-pled business practices, and it specifically did so when conducting "trade practices" with Plaintiffs and the other members of the Washington, D.C. Subclass, by depriving them of truthful, non-misleading information about competition in the online market for the sale of contact lenses.  It also violated various provisions of the CPPA when, through its suppression of advertising, it created the false representation that it sold its lenses at the lowest prices in the marketplace.

100.     Plaintiffs and the other members of the Washington, D.C. Subclass are not sophisticated experts who have independent knowledge of 1-800 Contacts' business practices, trade restraints with rival sellers, or deceptive claims about its pricing practices.

101.     By employing the above-alleged restraints of trade, and by engaging in false, deceptive, and misleading advertising, 1-800 Contacts intended to induce customers to purchase its goods at supracompetitive prices.  1-800 Contacts succeeded in the effort and thereby made sales to Plaintiffs and all other members of the Washington, D.C. Subclass, at supracompetitive prices.

102.     By so acting, 1-800 Contacts has violated the following express prohibitions of the CPPA that appear at D.C. Code § 28-3904.  1-800 Contacts has engaged in actions that:

a)     § 28-3904(e): "misrepresent as to a material fact which has a tendency to mislead;"

b)     § 28-3904(f): "fail to state a material fact if such failure tends to mislead;"

c)     § 28-3904(j): "make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;"

d)     § 28-3904(k): "falsely state the reasons for offering or supplying goods or services at sale or discount prices;"

e)     §28-3904(r)(3): create a "gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees."

103.     Plaintiffs and the other members of the Washington, D.C. Subclass have suffered damages in proximate consequence of 1-800 Contacts' above-pled violations of the CPPA. Plaintiffs and the other members would not have purchased contact lenses from 1-800 Contacts had they known the truth about its trade restraints and deceptive advertising claims.  Moreover, Plaintiffs and the other members paid higher prices for these contact lenses than they would have done if 1-800 Contacts had not restrained trade while making the deceptive advertising claims.

104. As a co-conspirator, 1-800 Contacts is jointly and severally liable for damages suffered by the Washington D.C. Subclass as a result of online sales by its co-conspirators.

105. Pursuant to D.C. Code § 28-3905(k)(2)(A), Plaintiffs and the Washington, D.C. Subclass are entitled to treble damages, or $1,500 per violation, whichever is greater. In addition, Plaintiffs and the Washington, D.C. Subclass are entitled to appropriate injunctive relief to prevent 1-800 Contacts from continuing to harm consumers in Washington, D.C. by its above-pled practices, pursuant to D.C. Code § 28-3905(k)(2)(D).

WHEREFORE, Plaintiffs seek redress for the harm that they and the other members of the Washington, D.C. Subclass have suffered because of 1-800 Contacts' violations of the CPPA.

## VII. PRAYER FOR RELIEF

Plaintiffs now pray to this Court for the following orders and redress, to which they are entitled by law and/or under the specific statutory provisions cited below.

**First Cause of Action**:

a) Certification of the proposed Nationwide Antitrust Class.

b) Appointment of Plaintiffs Daniel J. Bartolucci and Edward Ungvarsky as the class representatives and Boies, Schiller & Flexner LLP as interim class counsel and class counsel.

c) Costs for giving required notices to class members, and all associated costs.

d) Compensatory damages, trebled under 15 U.S.C. § 15.

e) Pre-judgment interest, as authorized by 15 U.S.C. § 15.

f) Injunctive and declaratory relief, as authorized under 15 U.S.C. § 26.

g) Costs of suit, including reasonable attorneys' fees, as authorized by 15 U.S.C. §§15 and 26.

h) Such other relief as the Court deems appropriate and just.

**Second Cause of Action**:

a)      Certification of the proposed Washington, D.C. Subclass.

b)      Appointment of Plaintiffs Daniel J. Bartolucci and Edward Ungvarsky, as the class representatives and Boies, Schiller & Flexner LLP as interim class counsel and class counsel.

c)      Costs for giving required notices to class members, and all associated costs.

d)      Treble damages, or $1,500 per violation, whichever is greater, as authorized under D.C. Code § 28-3905(k)(2)(A).

e)      Punitive damages under D.C. Code § 28-3905(k)(2)(C).

f)      Injunctive relief, as authorized under D.C. Code § 28-3905(k)(2)(D).

g)      Attorney's fees, as authorized under D.C. Code § 28-3905(k)(2)(B).

h)      Such other relief as the Court deems appropriate and just. D.C. Code § 28-3905(k)(2)(F).

## VIII.   DEMAND OF JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.


DATED:  January 13, 2017              Respectfully submitted,


BOIES, SCHILLER & FLEXNER LLP


_Scott E. Gant_
_____
William A. Isaacson (D.C. Bar No. 414788)
Scott E. Gant (D.C. Bar No. 455392)
Boies, Schiller & Flexner LLP
1401 New York Ave. NW
Washington, DC 20005
Tel. (202) 237-2727
Fax (202) 237-6131

Carl E. Goldfarb (Fl. Bar No. 0125891)
Boies, Schiller & Flexner LLP
401 East Los Olas Blvd, Suite 1200
Fort Lauderdale, Florida  33301
Tel. (954) 356-0011
Fax (954) 356-0022

*Attorneys for Plaintiffs*

28